May it please the Court, I'm Corey Briggs for Appellants. We're here on an appeal of the District Court's granting of summary judgment against my clients. We raised a number of issues below. The only issue that we've appealed on is the RFRA claim. There seems to be no serious dispute that my clients are attempting to exercise their religious beliefs. The federal government, Bright Source, they don't challenge that my clients hold sincere beliefs, that they use the site for these purposes, as the briefs point out. The California Desert Conservation Area, one of the uses, it's supposed to... Counsel, the real question that occurred to me here was the importance of the particular small location in a vast area to the exercise of the religious beliefs. If you were proposing a project that, say, destroyed, I think it's called the Kaaba in Mecca, obviously that would greatly burden religious beliefs. On the other hand, if you have a project that is called Salt Song Trails, if you can use them and prey on them and all the rest of it, does it matter to the free exercise of religion? Does it significantly burden the exercise that you can't do it anymore in this location? This is the key issue, so I'm glad you raised it from the beginning. The answer to that from my clients, and in particular Mr. Van Fleet and Mr. Smith, they both tell you that going to the Salt Song Trails on this particular site is part of the meaningful practice of their religion. A pretty generalized statement. What is there about, and I'm interested in the same question and answer, but what is there about where this site is with relation to sacred, we're talking about five or four state area. On this project area, what are the sacred sites? What is the Salt Song significance with reference to where this project is? Can you lose any part of the Salt Song Trail, even if there's no sacred sites on it, just the fact that it's part of the trail, just not being able to use an eighth of a mile or a tenth of a mile or a half a mile or three miles in a four state area, burden you, your ability to follow this religious tradition and something that's sacred to these people? The answer is yes, and let me give you a somewhat long-winded answer to that because it's a little bit complicated, but I want to answer that directly for you. Part of my client's religious tradition is an oral history tradition. As I understand the Salt Song Trails, and you can get some of this from Mr. Figueroa's declaration, as well as Mr. Van Fleet's, is that there are locations along the way. So imagine a path, and the path might be five miles long. There might be a section of that path that is itself not religiously significant above the fact that it's part of the path, but along that path, you have, to say it the way I would best understand it, some significant markers. And for Native Americans along this part of the oral tradition and the handing down of their religion that they have to actually be at. They actually need to be standing at the marker. They have to have a certain view of the Clark Mountains. They have to be at a location where the sun rises at a certain time of the day at a certain time of the year. To be 50 feet away from that, I'm not going to stand here and suggest is not, is the big problem. The problem is that by putting the fence around the entire site, my clients can't get to the particular landmarks along the way. So, it's... Are any of the particular landmarks within the site, or is it just a matter of their landmarks all along the trail and that the trail runs through the site? They're on the site too, your honor. Could I ask you a question related to what you just said? I'm looking at this, I think it's Figueroa. Yeah. Alfredo Acosta Figueroa. Yes. And he says the trails span four states and represent ancient villages, gathering sites for salt and medicinal herbs and so forth. And I'm thinking, suppose you win. If you do, does that mean that RFRA protects the entire four state area from any development? Because you've got sites along the whole forest. Yes, I know. I'm going to do a slight dodge. I'm glad that I'm here and not up on the bench because that is a very, very tough call. And I think one could argue... Not so tough. Are you really saying that all of this four state area, most of Arizona and Southern California is within this protected territory? No, but I understand the temptation for somebody to say what Judge Kleinfeld was saying. What I am saying is that along these trails, there are what my client's religion has established to be important religious symbols and markers. How frequent are these markers? I'm sorry? How frequent are these markers in these sites? Imagine if they're old and traditional, you And so you're probably going to have sites where you camped at night. There may be some of these that would be very frequent. So you'd have them really along this whole four state site trail. Well, look, the Ivanprov Project is only dealing with a portion of this. We're not arguing that you have to set aside the entire four states. What we are saying is that within the project, because it is now off limits, they've built a fence around it. My clients can't get to the portions that are significant for their religion. The way this was practiced, as I understand it from the declarations my client's telling me, is they used to do these runs. They do these sacred runs. Those runs would last weeks if not months. And they might spend all day running, literally running, from one state to another, stopping at these locations along the way. By putting up the fence, you are essentially requiring them to take a detour from point A to point C, except point B is religiously significant. Now where in the declarations is the identification of point C? All I found, there was one reference to an ancient village that's within the boundary of the project. That's the only reference I found to something that's within the boundary of the project. Yes, that's true from the declarations, but there was an administrative record below when it was dealing with the other issues that inventories the various sites along the way. My clients don't refer to it in their declarations. But even the BLM has acknowledged that this contains historic, religiously significant resources. We go back to the question that was posed earlier. If you have so many of these locations, are we in effect saying Arizona and Southern California and whatever else the trails in the four states go to, now off limits? Because you can't do anything there without hindering access to the trail that they went to run along or to one of the particular sacred sites. No, but we're jumping ahead in the analysis. If everyone accepts, and I think we do because it's not strongly disputed, that my clients are exercising their religion, the question then becomes, do we have a compelling need and has the government demonstrated that it is pursuing the least restrictive means? Well, no, no. There has to be a bargain. There has to be a substantial bargain. You're jumping the staff. When I say an exercise of religion, I think it is a... So let me address that. Yes, in order to perform your religious rites for my client's religion, to have no access to portions of the trails running through the site is a substantial burden. Mr. Van Fleet. Usually when we talk about cumulative impact, the cumulative impact argument comes from the preservationist side. In this case, I think the cumulative impact concern would come from the government side. The government would... It undoubtedly has a compelling interest in doing something somewhere on the salt song trails because the Native Americans did use a vast area and have villages and other sites that all had their sacredness because of their ancientness all over this vast area of Nevada and Southern California and Arizona. I can't remember what other states are in the area, Utah maybe. Even if the government didn't have a compelling interest at this particular spot of trail, surely it has a compelling interest to be able to develop something in the four state area. I think we would agree that the government has a compelling interest. Your Honor, you said the government has a compelling interest in developing the salt song trails. I think what you... No, something in the four state area. Okay. But the trails, to me what it sounds like... Again, I lose a little bit of comprehension because I didn't have a good map, but to me it looks like all the way people would get from town to town in the United States before the interstates. Once you build the interstates, a lot of the county roads, they quit maintaining a lot of them and they become impassable. So you can't go the old way. Look, the claim is not that you cannot touch any portion of the salt song trails. The claim is that there is at least one significant marker within the fenced off portion of the Ivanpah project. We're not arguing that you can't have your Ivanpah project. What we are arguing is that not being allowed to visit that site freely, and I'll explain freely in a moment. Are you saying all you want is for them to open the gate when an Indian comes and let them run through it and then you can have the Ivanpah project and they can go ahead? That's a good chunk of it. Let me clarify the other part. Because this is being phased, if there are other phases that would require the destruction of a particular site, of one of these particular landmarkers, at the very least the federal government would need to work with my clients to see whether there is a way of accommodating that. They've tried to work with them and your clients during the consultation process never brought up this problem. Actually, we sued over the lack of consultations down below. We didn't raise this issue on appeal, but if you were to look at Philip Smith's declaration, it is excerpt of record page 36, paragraph 13. He says, I tried to participate in the Ivanpah project review process as a tribal elder. I attended a meeting and I asked to be consulted on the project. BLM took my information but never consulted with me. I thought that was how the government consulted, by taking your information. No. When you're dealing with Native Americans, there is a heightened level of consultation. To simply hold a meeting for Mr. Smith to say, I'm one of the elders, whom they all know. I mean, this isn't some kid from Santa Monica in board shorts and a skateboard showing up and saying, hey, I have an issue. This is a regular person consulted by the ELM on these issues. He goes to the meeting and he says, we need to have a chat about this project. They do not follow up. There's a footnote in the federal government's brief that says, look, if you'd have just contacted us, we'd have come to some agreement. First of all, it's in a footnote. Second of all, there's nothing in the record to suggest that that's true. And third, it is the government's obligation to at least engage in a back and forth with my clients. So I'm not going to stand here and say that I think you would have to order Ivanpah or the federal government to remove a heliostat. I heard the argument before this one. I'm a realist. Some things may be irreversible, but to the extent you can let people onto the site, to the extent you can avoid destroying another landmark by at least having a conversation, that's not very intrusive at all. I would imagine they would have some security concerns. I recall that power generation facility near Palo Alto being blown up and destroyed not long ago, that one by Indians, as far as anyone knows. But I imagine that all power producing sites would now have major security concerns. Not only that, Your Honor, my clients would agree. One of the reasons why sites are not openly discussed during the process for approval, there's a special consultation process for the security measures. My clients are willing to show up and if they need to be searched because somebody thinks they're carrying a gun or something like that, that's not a problem. That doesn't interfere with their religion. What interferes with their religion is going to the site to finish a portion of the run and being told if you cross over the fence you're going to be arrested. That's the problem. And so if you cannot, I mean I'm not a religious expert so I can't give you a good example of a religious pilgrimage from a religion other than what my clients have that requires you to be at exactly a certain place at exactly a certain time. I know some religions require you to make a pilgrimage at some point in your life. I think if we were to say, well you know what, you can't visit the Vatican but you can go to Rome, I think there would be a problem. I think if you were to say to some folks, you can go to Jerusalem but you can't go to the Temple Mount but you can see it from afar, we would have a bit of a problem. That raises and harks back to the question that Judge Kleinfeld asked about the location in Mecca, unique significance. We have nothing that tells us that there is something so significant here unless every point along the trail or lots of points along the trail are of such significance. I don't see anything that supports the proposition that the Vatican is within the boundary of the Temple. It's not like there's one temple. There would be thousands of temples along this four states. I think the implications in your question is that it's okay to make this tradeoff in determining whether it's a substantial burden on my client's exercise of religion. And I think you're making the tradeoff too soon in the analysis. I say that respectfully. I think if you look at the declaration of Mr. Van Fleet, it's on ER 32, it's paragraph 8. I won't read you the whole thing but his final sentence is, the rituals that are performed at this site cannot be meaningfully replicated in accordance with my traditional and religious values at any other location. I will be the first one to confess, Your Honor, that we have not done. There is a reason that's not done. Native Americans and even the BLM do not publicly identify the exact sites. They have special codes. You have to be clear to hear it. The basis that he gives is basically my ancestors have come to this area for centuries and they've come to the whole four state area for centuries. That's what's hanging at least me up. What makes it sacred is that your ancestors came there for centuries. That's the four state area. And if you count other Indian tribes too, it's the whole west. Actually it's a lot of the east. They're not being deprived of other parts. I mean, look, if the federal government decided tomorrow that it's going to build solar facilities on every one of these historical markers, you can be darn sure we'd be filing a lawsuit in short order. Or military bases. That's right. That would be a problem. Are Indian traditions and the history of what your ancestry has done as a race or group religious? Are they necessarily, does that mean that they're necessarily a religious requirement as opposed to something that a particular race or culture treasures? Your Honor, I... In other words, do all the Indians that you're involved with here, the claimants here, are they all not just Indians but part of a religion within their religious thing? Do they all do the salt? Is it only one of them? Is it that people did it in the past? Can you be a member of this religion without doing the salt songs? Are you prejudiced? Is your religion taken away from you because you don't do a salt song or because you can't run? Yes. This is a rite of passage. Well, is that a religion? Yes. As part of the religion. And I realize I'm now eating into my deficit. I'm somewhat uncomfortable not with the questions but with the flavor of them in this sense. The Supreme Court has urged that we have to be careful about probing too difficult as the judiciary into the sincerity of religious beliefs. And if you have undisputed... We're not talking about the sincerity. We're talking about the existence. And that's two different things. That's all I was doing. And if you're uncomfortable, I've been in your position. I've been uncomfortable many, many times. And you're going to continue to be uncomfortable if you're going to continue to practice law. No, no, no. That's correct. Every day. I'm not really concerned with your comfort level. I meant that rhetorically, Your Honor. My point is that the clients have testified that this is part of their religion and it's a meaningful part of it. The federal government and Bright Source had an opportunity to dispute that below. They did not. So I think given that this was a summary judgment and viewing the evidence in a light most favorable... I don't think there's any issue as to the sincerity of religious beliefs. I think we're on the substantial burden question. And if you have a sacred territory that's defined as expanding over four states, it's not obvious on the face that the intrusion of this project in a small area at some distance on the trails that extend over this territory with one identified ancient village within the boundary of the project, that denial of access to that constitutes a substantial burden. Now maybe we don't understand the religion, but I don't think it's a sincerity question. It's whether this really prevents your clients from practicing their religion. I think that looking at how big of the area there is and saying it's just a small part of it, in my mind is like saying to the plaintiffs in Hobby Lobby, you know, there are 16 methods of birth control that you're not opposed to, so what's another four? In some ways I think it's just the flip side of the coin of what those plaintiffs had to take. Your Honor, I'm well into my deficit. We've helped you get there. Okay, thank you. May it please the Court, my name is Robert Oakley, Mr. Furlow, who also argued in the last cases, also sitting at counsel's table. I represent the federal defendants. He represents Bright Source. We split our time 15-5. Your Honor, the government has a strong policy to protect Indian religious beliefs and sacred sites, and even as a practical matter, you would have to assume that the government would not be here if all we had to do was move the boundary of the Ivanpah plant by a quarter of an acre or a quarter of a square mile or something like that. That is why the government made extensive efforts, which his clients did not cooperate. Did anyone during the consultation process give the government a map that showed a salt song trail running through the project area? Absolutely not, and it's interesting, that has not even happened to date. We are told today, I don't recall this from a prior brief, but there was an assertion that there is a marker on the site. I don't know where it is. I don't think your opposing counsel meant a physical marker. He was using the word, as I understood it, to mean an important location. That's another problem I have, is I don't understand a lot, and I think we've had. No, I understood. But you may well be correct. You may be well correct, but no one has told us whatever the marker is, whether it's a physical object or whether it's a sacred site, where it is. Now he says, well, we're not supposed to disclose these things in public. Surely there are ways of submitting material under seal. Well, it can be a little complicated. Some religions, for example, the Druze religion, nobody except Druze fully admitted to it know what it is, because the secrecy of the religion is part of the religion. Religions are different. The notion that a religion is theology, that's the Christian religion with a lot of Greek philosophy that had developed prior to the Christian religion's development. Plenty of other religions, the Jewish religion, doesn't have a lot of theology to it. Religions vary. It's easy for me to understand that there can be a religion of regarding an area as sacred, a large area, a holy land. That is true, but the procedures are set up so that the government has set up these procedures so that it can do the best to accommodate those beliefs. Well, can they tell you where the site is according to their view? In other words, how can you negotiate or deal with someone that tells you there's something there that's sacred, but don't tell you what it is or identify it or tell you where it is? How could you ever negotiate with them about something they can't tell you about? That's right, but you know, they didn't even tell us that there's a sacred site there. The public involvement was of the named place, the ones who filed declarations. Mr. Smith went to a public meeting and informed BLM that Ivan Pond meant good water. He said nothing about religious beliefs. As to the Indian tribes, and the government has a legal obligation to cooperate with Indian tribes on these types of things, registered letters, certified letters were sent to all the Indian tribes, including the ones that the council's clients belong to. And by the way, none of his clients are an Indian tribe. None of them responded. In Mr. Figueroa's declaration, in Mr. Van Fleece's declaration, in Mr. Smith's declaration, they say in 2010 they did a run to help protect the animals that were going to be harmed by the construction of the plant. So they knew in 2010. When did they tell us? They told us in their second amended complaint when they first alleged a RIFRA claim. But I think it's crucial. We've got maps. Are you saying they didn't allege the RIFRA claim until the second amended complaint? That is correct. It was dismissed without prejudice, replayed in the third amended complaint, and that's the one that's summarized. Did they tell you that they had sacred trails running through the site before the second amended complaint? No. No one raises to us. The lawsuits have been on a different basis originally, is that correct? Yes, if you look at the district court decision, you'll really see this, that that lawsuit in many ways mirrored some of the allegations in the lawsuit before. Typical environmental NEPA claims, FLIPMA claims, those sorts of things, they've all been dropped, including the consultation claim. They're no longer disputing that the district court judge properly ruled that as to, I believe it's Mr. Van Fleet, says he made a request to be consulted with. The court held that the government only has a legal obligation to consult with tribes, which we show that we did, but he never raised anything. Anyhow, they lost that claim, and they expressly abandoned it in the opening brief, and so it doesn't have any relevance now. Let me ask you a question that may be hypothetical. Let's suppose for the sake of discussion that an important part of the Native American religion among this group is running on trails to worship at all the ancient sites of that Indian group, and these sacred trails run through the entire four-state area. Let's assume that it would substantially burden the people that believe in that religion to do anything that impinged upon, or intersected, or changed a sacred site. How would you do that under RFRA? I think you're in a difficult position. I think this was noted in the Navajo Nation en banc decision, where the court said that there could be a question about imposing one group's religious beliefs to trump everyone else's, so that you'd be saying that this group of people, because of their beliefs, have a veto power, or at least push into a strict scrutiny test, which is a very difficult test to survive. Where does the question get taken up? I mean, we have quite... The argument here appears to be focused, in the litigation to date, on substantial burden. If it's determined there's a substantial burden, then the government can establish there's a compelling interest. It doesn't look like this litigation has gotten to the compelling interest issue so much, and yet that would seem to be where the factors you're talking about now would come up. They could come up there, but they could come up, frankly, in a constitutional way, because you would be saying... I mean, what happens if there are other Native Americans who have different beliefs that overlap these areas, where they want to do different things that interfere with Mr. Briggs' clients? I'm not sure that matters for this case. The question here is whether what this project has done... The first question is whether... And we're past the sincerity of religion. The question we're really discussing is whether this project imposes a substantial burden on the exercise of plaintiff's religion. And if it does, then there may be another question with regard to compelling interest. I want to make sure I understand the hypothetical. So you're saying, assume that absent protection of all this area in the four-state area, there will be a substantial burden on plaintiff's religion. Under the statute, you then get kicked to the second part of the statute. That's right, and it wouldn't make any difference whether they complained about it in the comment period or anything like that. If it substantially burdens their religious belief, what difference would it make whether they consulted with them about an environmental impact study or any other things? Well, and that's another point, though, that would go to... And I don't want to leave this out. I think there would be a threshold constitutional question as to whether it would work, because they could go back now. There's no statute of limitations to RFRA. They could go back to developments that the government has been improving that have been in place for decades and say, wait a second, this is interfering with my exercise of religion within this four-state area. So we've got to see now, we've got to apply a strict scrutiny test to this airbase in Nevada. You would open up, again, a potential litigation, and the point being that the way RFRA has worked in the past is individuals who have religious beliefs have either been denied a government benefit or they've been told they can't do something that's essential to their religion. They're saying the fence is what says they... Is what coerces them not to do something that's essential to their religion. And you know, there's some... Let me just go off on that for a second. There's some uncertainty because the declarations were done when the site was under construction, and this is another burden it puts on the government in terms of litigating the case. We don't know what they're talking about. We don't... With all the maps, we don't know where they go. It may be, because the construction site occupied a bigger footprint than the finished plant. It may be that the salt zone trails, now they... As long as they stay outside the fence, they're fine. But we don't know. We don't know where they are. And we've never been told where they are. And that puts the government in a very difficult position. And to me, it's a threshold burden. You could look at the pleading cases, and I know this case was resolved on summary judgment, but I'm thinking about the cases like Twombly and Iqbal that came out of the Supreme Court that said you can't just allege legal conclusions. You've got to provide facts. And it's relevant here that I think that they've just been deliberately vague. They've never presented something so that you could say... This would be a very different case if we were up here because we were refusing to move the plant 500 yards, half a mile in one direction. I don't think we wouldn't be here, but just assume we were. The reason I asked you that question is this Navajo Nation case that we're bound to follow has some very good language for you. It distinguishes between burden and substantial burden and says, where there's no showing the government has coerced the plaintiffs to act contrary to their religious beliefs under a threat of sanctions or condition government benefit upon conduct that would violate the plaintiff's religious beliefs, there's no substantial burden on the exercise of their religion. That case is holding, at least there, it may be a burden, but it's not a substantial burden if it doesn't do one of those things. However, in a later part of the case, we said a law prohibiting the Indian respondents from visiting the Chimney Rock area would raise a different set of constitutional questions. And here, as I understand the plaintiff's case, they're saying the questions are raised here because they're fenced out of the project area. That is what they're saying. We're not certain because we don't know. Again, we have no information. It's never been provided to us. Clearly, some of their claims that were mentioned in the opening argument about glare from the mirrors will affect a view outside the site from a mountain. Those are very clearly within the framework of Navajo Nation. But Chimney Buzz Navajo Nation, and there was a follow-on panel decision in the Snoqualmie case, had to recognize at least some denial of access. There was an allegation of denial of access in Snoqualmie, although the court did not conclude that that, in fact, was the the structures. Similarly, in Navajo Nation, you didn't have 24-7 access to the ski slopes. There was a lodge there. You couldn't have gone into there. And I think a broad-based, I mean, certainly if the government were to say, well, forget the salt-sawing trails altogether, that would be very subject, even under tradition. Their argument is, if you keep us from running the salt-sawing trail, pardon me, by keeping us out of that trail, which they won't tell you where it is, according to you, if you keep us from running that small portion of it, wherever it may exist, if it exists here, you're keeping us from doing our religious ritual. I mean, that little part is, the site is not like the temple in Jerusalem. It's a site that expands along some place along a line that we don't know where it is, extends for over four states. Yes, I mean, that's their argument, and there's a case... And then the question is, to me, is can you say that in the context of what we have to take as their legitimate basis of their religious faith? Can we take one part of that trail, wherever it may be, and know that it's not going to be there anymore, and say we haven't substantially burdened? I think you'd have to know for sure that it was a trail. If I could refer to a case Judge Kleinfeld decided, the Hunai case, which it was not a RFRA case, it was National Historic Preservation Act, where the question was, had the government preserved some trails that had been used in conflicts between Native Americans and Russians in Alaska? And the court pointed out that these were very poorly marked, that knowing that something important had happened in the area was not enough to make the entire area sacred. Again, we had just the vaguest, even today, allegations, well, there are markers. We don't know where the markers are. The markers weren't found. I was taking the markers as physical. Perhaps that's wrong. But there has to be something that tells Mr. Briggs' clients how to find these saltstone trails, and we don't know what they are. And surely that could have been protected. So the failure for years and years, this plant is constructed, it's generating electricity, I'm not sure what we could do here. We could have done something if they'd talked to us soon, possibly. I'm going to let Mr. Furlow have his time. Mr. Furlow, welcome back. Thank you, Your Honor. It's been a while. But still introduce yourself, for the record. May it please the Court, Albert Furlow here on behalf of defendants, co-defendants. We did not have to intervene, we were sued directly in this case. And I just want to offer a few clarifying points again. Plaintiffs' appellant counsel mentioned that the project is phased and there might still be some things that could occur that would make adjustments. The project was phased, it was completed in December of 2013. The last phase. Yes. It's fully constructed, it's fully operational, and it's producing electricity in all three of its units. There's no more construction to be done. In that light, from a practical standpoint, we still, as counsel for the government has pointed out, we don't know where this trail is. We don't know. So what are the prospects of working something out? Well, Your Honor, at the time, and this gets into the timing aspect too of when the request was made, that's alleged in the declarations. At the time the request was made, the project was under construction. We don't know where they went, where they tried to get to. I'm not asking you to commit to something because you don't know what the request would be. That's right. But the suggestion has been made that perhaps there's a way to give access to the site or sites and trail that would alleviate the burden which plaintiffs allege they are suffering. Well, Your Honor, there may very well be because with the construction completed, there's not a monolithic fence surrounding the entire site. There are gaps in the fencing at this point in time. There may not have been in 2011 when they attempted. At this point in time, there are pathways that would allow anybody, let alone the plaintiffs here, but anyone to go from point A in the north of the project to point B at the south of the project, and it actually runs along the transmission line that serves the project. That's a separate right-of-way, and it's an open-access way to allow people to go from the north to the south. That part's not even fenced off. It's not fenced off. You mean they could run through right now along that transmission line path? That is my understanding, Your Honor. They may not have been able to do that in 2011. That may be true. We don't know where it was that they asked, but given the fact that it was an active construction site. No one's going to threaten to arrest them if they have a religious run through the transmission line cut? Well, my understanding is that there would be no apparent reason to do that. Whether or not there are other regulations that govern the right-of-way that's in place to allow those transmission lines to go through would require some type of permission or advance notice, and that is not given, I don't know. Usually the way power line easements are written, it's an easement for power and for such uses as are necessary to preserve power. So the electric company can come in if a tree falls on the line. They can go on the ground to take care of the tree. I don't know quite what you mean here about the pathways, whether the power company could not come in and set up a permanent presence or come in for reasons that had nothing to do with maintaining the line, and people other than the power line cannot come into a power line easement. I don't know quite what you mean here. Well, Your Honor, it's my understanding, and this was my discovery as preparing for the argument, is that there are pathways through the site, not in the area where the project has the heliostats, the mirrors, the towers. Those are fenced off. According to the terms of the right-of-way that my client obtained, the perimeters around those are open. There are pathways around the perimeters to allow us to fix the fence. Those pathways are open. We can't stop people from walking along the fence line there. And it is also our understanding that the right-of-way that allows the power lines to go through, which are not fenced off for our project. So you're saying the fenced-off area is a much smaller portion of the five square miles. It's not the five square miles. That's correct, Your Honor. There is a pathway through there that exists. But the problem that I see in this case is that that solution may not necessarily comport with what is their religious tradition. In other words, if there is, in fact, a site that's within these fenced areas that they can't visit or run along, does the preclusion from being able to run along that particular portion create a substantial burden on their religion? And that question still exists. Well, I agree, Your Honor. But the determination of that question can be found in Navajo, the Navajo case. And this would appear to be the first formulation, which is coerced to act contrary to their religious beliefs under the threat of civil or criminal sanctions. And going back and tracing the history of what that meant, the court in Navajo Nation cited to the Yoder case, the Supreme Court case. And that's at page 1069 of the Navajo opinion. And the court there quoting Yoder said, the Wisconsin law in question in Yoder affirmatively compelled the defendants under the threat of criminal action or sanction to perform acts that undeniably add odds with their religious beliefs, with the fundamental tenets of their religious belief. That's the framework for determining substantial burden. Well, here on threat of arrest, plaintiffs are not to, again, we don't know where the markers are. But for the purpose of this question, assume that one of those sacred locations is within the fence and or that part of the trail is within the fence. So plaintiffs aren't allowed to go there, which they say is necessary for them to implement their religious beliefs. Doesn't that qualify under the definition you just gave? Well, Your Honor, I'm not sure that, I would offer that we're not, it doesn't coerce or compel the plaintiffs to act. Don't go there. Against. Don't go there on pain of arrest. But it doesn't compel them to do anything other than not do anything. Well, if their religious beliefs they say require us to go to this location and they can't go to this location, if we're talking about Mecca and they couldn't go to Mecca, not being able to do something may, in fact, compel them to do something contrary to their religious beliefs. Yes. And that gets, I think, the answer to that part of the question lies in the scope of what it is that has been requested here and the timing of it. Here, the government is approving a project, use of public land on a right-of-way, going through a public process. You heard some of it in the first argument that the whole NEPA process. There's a consultation process under the National Historic Preservation Act under which the government is required to reach out to and consult with Native American tribes on issues that are of significance to those tribes. That outreach was done to the tribes. None of them indicated that there's an issue here. In 2011, the complaint was amended to add the RFRA claim for the first time. When was the outer perimeter fence that took the whole area site, not divided like you have now, when was that fence that precluded someone from being able to run through there, when was that fence built? Your Honor, I don't know, and quite honestly, I don't know if there was a fence that precluded everyone. All we know is that some of the plaintiffs went up to a fence and spoke to somebody who said, gee, if you go there, you might be arrested for trespass. Right now, as it exists now, the project can't arrest people for trespass. If someone were to jump the fence, for example, right now, and go inside the area where the mirrors were, the procedure is to call the sheriff. We're not a police agency. We don't have enforcement powers. So another fundamental, and I'm giving Mr. Briggs a lot of time here, and we don't have endless time to give, so please wrap it up. Just wrapping it up, one of the fundamental problems with how this case has been litigated and determined is that the RFRA claim didn't come up until the second amended complaint. The declarations didn't come in until the motions for summary judgment were filed, and in a separate filing as part of the motions for summary judgment, the plaintiffs, in their Rule 56 separate statement, it's docket 109-2, and you can find at ER 46, we responded to, they alleged in their material facts, that the declarations were there for standing purposes. We said in our response to that at ER 46, that's fine as far as standing goes, but if you're asserting these issues for the substantive claims that you're making, we object. So I would submit that. I think we have your position. Thank you, Your Honor. Six minutes over, that's plenty. Mr. Briggs. Thank you, Your Honor. I'm trying not to spend all of my deficit. Point number one, I'm almost certain, but I can't point you to anything in the record because this is a conversation about things after what happened in the district court. The fence wasn't around the site when it was initially approved. That started after the approval. That's why the amendment was done. Secondly, when we submitted our declarations on summary judgment, the defendants had an opportunity to do discovery in the case. They didn't do anything to test. Wait a minute. You're the one, you're the side that wanted access to the sacred trails. Did you ever give anyone a map of the trails? The answer is yes. It's already in BLM's possession. It has been in BLM's possession for a long time. The consultations that are done, so let me be exactly precise, Your Honor. Did my clients, in connection with this lawsuit, hand them the map? No. Did you describe it in your petition? We didn't identify the precise. And to the extent you're saying that they had it, was that description anything other than something that ran along four states and ran through the projected site? Was it specific? Do we know where it is? Yeah, the BLM actually has the inventory. If you were to look at the EIR, which isn't in the excerpts before you today, if you were to look in that, they'll tell you that when they do the archaeological and historic analysis on the site, they have these code numbers. I can't tell you how to transcribe, but they have this stuff marked. They've had it for years. They have their own archaeologists and historians who know all of this stuff. These are the people who do the consultations with the tribes and the tribal elders. To say that in this lawsuit my clients and I did not hand them the map is to feign ignorance on subject matter that the agency and the tribes have long shared a common understanding over. That answer confused me about the map. I'm trying to figure out when the developer and BLM could know just where the trails were so they could provide for access. They would have known that during their site work, during the initial workup of the environmental impact statement. Do we know? Is it in the record here? Can we look at a map? Your Honor, I don't know what the page number is. I don't know. I will also tell you that even the maps that we have do not list the exact GPS or even a reasonably close location for these sites because they are treated confidentially. In order to discuss them, the tribes meet in person with BLM. When I say map, you don't mean like a AAA map that shows the area being mapped and it shows the things in the area, in this case a power plant, and it has lines on it for a trail. You don't mean that kind of map. I kind of do. I have never seen it with my own eyes. Here's how it's been described to me by my clients. It's like the U.S. Geological Survey map somewhat, so kind of like a AAA map. Then they'll have circles or marks on it, and next to that will be a code, A3B7, something like that. Then you go look at a list, and it tells you that A3B7 is such and such. So they have a common understanding of it. The reason you don't put A3B7 out there publicly is because when somebody does a FOIA request for the list that says what A3B7 means, now the public knows that this particular religiously significant or culturally significant site is right there, and that's a no-no. So that's the best I can answer your question, Your Honor. The last thing I'll say is the talk about the fence being moved, I don't know what to say. We're talking about changes that have happened. I'm looking at my client's declaration April of 2012. We're three years later. If things have changed, that's a factual issue that the district court should probably look at. I realize, though, that you still have the difficult task of figuring out if it's still within an area that's fenced off, is that a substantial burden? The only thing I would say to you is that just because the sheriff's not there to watch somebody hop the fence, in other words, because you managed to not get caught, that's not the test that Navajo Nation laid out. It's the threat of prosecution that is the burden, not the fact that the sheriff gets there in time to see you scaling the fence. With that, I submit thank you very much for your time. We thank you, and we thank all counsel for your helpful arguments.
judges: Kleinfeld, Benavides, Clifton